FT. WORTH & RIO GRANDE RAILWAY COMPANY ET AL. v. E. B. DAY.

Decided April 1, 1909.

**1.—Master and Servant—Safety of Machinery—Use for Purpose not Intended.**

Where an appliance becomes customarily used by employees for a purpose for which it is found convenient but for which it was not intended, the master who knows and has not prohibited such custom may be held liable for negligence if he fail to inspect and keep in repair such appliance with reference to its proper condition for such use.

**2.—Same—Fact—Case.**

A switchman attempting to get upon a moving car in the yards, the track being higher than the ground on which he stood, grasped the ladder and placed his foot on the oil box of the truck to step thence to the stirrup iron, below the sill of the car, which served as the bottom step of the ladder but which he could not reach otherwise from his position on the ground.   The wooden cover of the oil box was defective and gave way, throwing his foot under the wheel. Such use of the oil box of the truck as a step from which to reach the ladder was convenient, was customary among switchmen, but the box was not designed for such use.   Held that the question of negligence of the master in failing to to inspect and repair the oil box cover with reference to its adaptation to such use was properly submitted to the jury and a recovery by the servant therefor was supported by the evidence.

**3.—Contributory Negligence.**

A switchman was not to be held negligent as matter of law in using the oil box of the truck as a step from which to get onto the side ladder in boarding a moving car, when the ladder, though safe, was too high to be otherwise reached from his position on the ground.

Appeal from the District Court of Tarrant County.   Tried below before Hon. Irby Dunklin.

*Andrews, Ball & Streetman* and *H. M. Chapman,* for appellants.— Where a brakeman uses an attachment to a freight car, which attachment was never designed or intended to be used as a safety appliance, but is used as a matter of convenience by the employe injured in its use, the employer is not liable for consequent injury to the employe for the reason that, having performed the full measure of its duty in furnishing safety appliances to the employe adequate for the proper performance of his duty, no duty rests upon it either to inspect the appliance made use of by the employe or to see that it is free from defects.   Williams v. Choctaw, O. & G. R. Ry., 149 Fed., 104; Cawood v. Chattahoochie Lbr. Co., 54 S. E., 944; New York C. & W. L. Ry. v. Hamlin, 83 N. E., 343; Hutchison v. Cohankus Mfg. Co., 112 S. W., 899; 8 Current Law, pp. 920-21, note 90.

When the employe avails himself of the more dangerous way, and is injured thereby, no liability is imposed on the employer.   Reeves v. Galveston, H. & S. A. Ry., 98 S. W., 929.

*McLean & Carlock,* for appellee.—Owing to the fact that by long usage among switchmen the axle lid on cars had been put to this use without objection or remonstrance or prohibition on the part of railroad companies, and the companies thereby having recognized, authorized and adopted such use, said axle lids under these circumstances became impressed with a secondary use and purpose, which the railroad companies could not ignore in dealing with their employes. Coates v. Boston & Maine Ry. Co. (Mass.), 10 L. R. A., 769; Dupree, Receiver, v. Tamborilla, 27 Texas Civ. App., 603; Dunn v. New York, etc., Ry. Co., 107 Fed., 666; Prosser v. The Montana Cent. Ry. Co., 30 L. R. A., 814; 1 Labatt on Master & Servant, secs. 28, 27, 26.

The fact that a servant is injured because of the way of doing the work selected by him, when if he had selected another way the injury would have been avoided, does not as a matter of law render him guilty of contributory negligence, the true test being, whether he exercised ordinary care in performing the work as he did, and this question arises in this case upon conflicting evidence, making it a proper question for the determination of the jury. Missouri, K. & T. Ry. Co. v. Keefe, 37 Texas Civ. App., 588; Dupree, Receiver, v. Tamborilla, 27 Texas Civ. App., p. 607; St. Louis & S. F. Ry. Co. v. Vestal, 86 S. W., 790.

WILLSON, CHIEF JUSTICE.—The appeal is from a judgment against appellants in favor of appellee for the sum of $4,000 as damages for personal injuries suffered by him as the result, as alleged, of negligence on the part of appellants.

From the record it appears that appellee received the injuries complained of while in appellants' service as a switchman in their yards in Fort Worth, at about ten o'clock of the morning of April 19, 1908. At the time he was injured, in the discharge of his duties as appellants' switchman, he was attempting to mount a box car moving at a speed of six or eight miles an hour. The car was a "foreign car"— that is, it did not belong to appellants. It had been in their charge only about two days. It had a ladder or steps on its side and near one of its ends. The bottom round of the ladder, called the "sill step," extended twelve or fourteen inches below the sill of the car, or about fourteen inches above and twelve inches towards the end of the car from the oil-box of the axle of the car. The oil-box referred to was about eighteen inches above the top of the rail of the track. It was provided with a wooden lid. At the point where the accident occurred the ground on the side of the car where appellee attempted to mount it was about fourteen inches lower than the top of the rail. In attempting to mount the car appellee grasped the lower round of the ladder with his hands and placed his left foot against the lid of the oil-box, intending to throw his right foot on to the "sill step." Because the wooden lid of the oil-box was rotten, and therefore broke or slipped in its place when appellee threw his foot against it, his foot slipped from it, causing his right foot to miss the sill step and go under and in front of the wheel of the car, which ran over and crushed it. It further appears from the record that appellee had had about nine years' experience as a switchman, and that as such he had been

in appellants' employ about five years, and in their Fort Worth yards about three months; that oil boxes like the one he put his foot against in the effort to mount the car usually, though not always, were provided with iron lids; that while the oil-box was not primarily designed or intended to be so used, it was and long had been a custom, almost universal among switchmen, to use the oil-box in mounting such cars at places where the ground was lower than the track, and that where the ground was as much as fourteen inches lower than the track brakemen could not mount such a car while moving six or eight miles an hour by means of the ladder alone. It further appeared that if appellee at the time he attempted to mount the car knew the lid of the oil-box was a wooden instead of an iron one, he did not know it was unsound.

Appellants insist that the evidence established that they had discharged their duty to appellee by providing the ladder for his use in mounting the car, that they owed him no duty to inspect the lid of the oil-box and have it in proper repair for the use he attempted to make of it, and that therefore an issue as to negligence on their part was not made by the evidence and should not have been submitted to the jury.

In the application of the rule imposing upon the master the duty to his servant "to use ordinary care and diligence to provide such sound and sufficient appliances or instrumentalities as are reasonably calculated to insure the safety of the servant in performing the service, to discover and repair any defect therein, and to provide a reasonably safe place in which to perform the service" (4 Thompson on Negligence, section 3987), it has been uniformly held that when the master has discharged the duty he is not liable on account of an injury suffered by the servant as a result of his using such appliances or instrumentalities for a purpose not required, nor contemplated or intended by the master. But it not infrequently happens that an appliance or instrumentality designed and intended by the master for a specific purpose alone is found to be convenient and effective for another or other purposes. There can be no doubt, if the master, discovering the new purpose to which the instrumentality advantageously could be applied, should direct its use for such purpose, the duty would at once devolve upon him to use ordinary care and diligence to discover and repair defects in it with reference to such new use. Should the rule be different, if the master's servants, themselves discovering the new use to which such instrumentality could be put in discharging their duties, apply it to such use, in the absence of the master's instruction to do so, but without objection and with knowledge on his part that it would be so used? In considering the question it will be instructive to refer to some of the cases where it has been presented and determined with more or less directness.

In Lauter v. Duckworth, 19 Ind. App., 535, 48 N. E., 867, the defendant had constructed a "dry well" of loose bricks for the purpose of receiving waste water from a factory, which entered the well through pipes at the bottom, along with a little steam. Afterward the well was used to receive waste steam, which was let into it by a pipe in the top. The pipes in the bottom becoming stopped up by

sediment, the steam forced its way through them and through the walls of the well into the surrounding earth, where it formed a hole underneath the surface filled with steam, hot water and hot mud. While the plaintiff was passing over the spot in the discharge of his duties the earth gave way beneath him, precipitating him three or four feet into the hole and scalding him. With reference to a contention made by the defendant that the evidence did not show the well to have been constructed for uses made of it, resulting in the injuries to the plaintiff, the court said: "Appellant must be held to know the manner of construction and the use to which it was put; and if this improper use was permitted by him it was equivalent to its construction for such use, so far as his liability might be affected for damages resulting from such use."

In Dupree, Receiver, v. Tamborilla, 27 Texas Civ. App., 603, 66 S. W., 595, the plaintiff, while in the service of Dupree as receiver of the Citizens' Electric Light and Power Company of Houston, had gone to the top of one of the company's poles to trim an electric lamp supported there by iron rods extending over the top of the pole from the arms of an iron casting fitted over the top of the pole. Plaintiff thought the rods were solid, and could not have ascertained that they were otherwise by the exercise of ordinary care in the discharge of his duties as a trimmer. As a matter of fact the rods were hollow and weakened by rust, and broke when plaintiff, in reaching a point from which to trim the lamp, rested his weight on them. As a result of the breaking of the rods plaintiff fell to the ground and was injured. The receiver contended that the evidence showed that the rods were designed alone to support the lamp and its hood, and were never intended to be used as a means of climbing to a position necessary to be assumed by a trimmer in order to trim the lamp. The court said: "It should be borne in mind that the lamp was at a considerable and dangerous height from the ground; that the trimming of the lamp required the use of both hands. The position necessarily assumed in performing this task placed practically the entire body higher than the top of the pole and the metal casting or cross-arm, thus leaving nothing by which the operator could steady or support himself save the rods supporting the lamp and hood. The consensus of the testimony shows that even the most careful and prudent and experienced trimmers, and those who knew the rods were not solid iron, placed some weight on these upright supports while adjusting the carbons, and this is true in the very nature of things. The defendant must have known from the character of the structure that the rods would be used by trimmers in reaching and maintaining their perilous position." And in another part of the opinion, referring to the rods, the court said: "It was the master's duty to construct against the use to which he might reasonably expect they would be subjected."

In Dunn v. New York, N. H. & H. R. Ry. Co., 107 Fed., 666, Dunn, in the service of the railway company as a brakeman, was injured while engaged in uncoupling cars from the front end of a locomotive. To steady himself, with one hand he grasped the round plate fastened in the middle of the front end of the boiler, known as the "figure plate," while with the other he pulled the coupling-pin. The plate

was loose, turned when he grasped it, and as a result he was thrown under the pilot of the locomotive and thereby was injured. The railway company insisted it was under no obligation to inspect and keep properly secured the plate referred to. The Circuit Court of Appeals in overruling the contention, after discussing the manner in which the uncoupling was to be made and the means provided by the railway company to protect the brakeman while making it, said: "It appears, then, that the defendant set this engine to work switching, and put plaintiff to work on it at a place where defendant knew he must hold on to something. It provided no special handhold; it directed no particular projection to be used as such; it forbade no such use; it maintained on its engine a figure plate, adapted for use as a handhold, and so located that a man of plaintiff's size would find it the most convenient thing to take hold of. . . . Knowing it would be so used, if for any reason it was difficult to maintain it firmly in position, or to inspect it, the defendant might have prohibited its use for that purpose. Not having done so, it owed a duty of inspection commensurate with the purpose which it must be assumed that defendant knew it was subserving."

In Coates v. Boston & Maine Ry. Co., 10 L. R. A., 769, decided by the Supreme Court of Massachusetts, Coates, a brakeman, was directed by the conductor of a freight train to ride upon a coal car for the purpose of pulling out the coupling-pin and separating it from other cars. He started to get on the rear of the coal car, put one hand on the top thereof and tried to put his left foot on the jaw-strap, an iron bar running below and between the ends of the axles, out of sight under the body of the car. The jaw-strap was not where it should have been; his foot went on the rail and was crushed. The jaw-strap was intended only to strengthen the car, but such cars were not provided with other means for getting upon them, and in getting upon them it was the custom of brakemen to use the jaw-strap as Coates attempted to use it. There was evidence that the jaw-strap had been gone for some time, and from this evidence the court said the jury might have inferred that the railway company knew of its absence. The court also thought the evidence sufficient to support a finding that the company reasonably should have anticipated that brakemen ignorant of the absence of the jaw-strap, might be, as Coates was, ordered to and might go upon the car to uncouple it, and that such a finding would be sufficient as a basis for the further finding that the defendant was guilty of negligence in failing to warn Coates of the fact that the jaw-strap was absent. The court declined to consider as a question made by the record in that case the question made by the record in this one, saying: "We do not consider whether, in view of the constant use of the jaw-strap as a means of getting upon the car, and the fact that we can not pronounce it to be a negligent use, the company might not properly be taken to have notice of it, and if it did not prohibit such use, which probably would have seemed absurd to all concerned, then be bound to see that the jaw-strap was reasonably safe for this secondary use, although not that for which it was designed."

In Prosser v. Montana Central Ry. Co., 30 L. R. A., 814, a road en-

gine instead of a switch engine had been used in switching cars. Because the road engine had a pilot and no foot-board in front to aid in the switching, a flat-car had been placed in front of the engine. The flat-car was provided with a brake-beam and staff. Plaintiff in the discharge of his duty as a brakeman stepped upon the brake-beam and grasped the brake-staff. It was bent, turned with him, and he fell and thereby was injured. It appeared that the brake-beam and staff were used by brakemen for the purpose plaintiff was attempting to use same. The court said: "The brake-beam and staff being used for the purpose of mounting the car by the brakemen and switchmen, we do not hesitate to say that to allow the apparatus to remain in the condition it was was a showing of negligence sufficient to go to the jury."

In Donk Bros. Coal & Coke Co. v. Retzloff, 229 Ill., 194, 82 N. E., 214, Retzloff, while in the coke company's service, had been injured as the result of the latter's failure to have in proper repair bumpers on cars used in its mine which it became Retzloff's duty to couple. It was argued by the coke company that the proof showed that the bumpers were not placed on the cars for the protection of employes engaged in coupling them, but were placed there to prevent the bodies of the cars from striking against each other when the cars came together. In disposing of the contention the court said: "It is apparent from the evidence that the bumpers were of material assistance in enabling employes to make couplings, and whether the primary purpose of placing them on the cars was to enable couplings to be made by employes and to protect them while being made, or not, they did serve that purpose, which appellant was bound to know, and it became its duty, therefore, to exercise reasonable diligence in keeping them in a reasonably safe condition for use."

On the authority of some of the cases to which we have referred and others to which we have not referred, in his excellent work on Master and Servant (volume 1, section 28), Mr. Labatt states as the qualification of the rule indicated by them: "If new functions are imposed upon an instrumentality by the master himself or his representative, and the servant is thereby exposed to undue risks, the master must answer for any injury resulting from those risks, and can not excuse himself by showing that the instrumentality was a suitable one for the performance of the work for which it was originally supplied. The master's acquiescence in the use of an appliance for some purpose other than that for which it was intended puts him in the same position as if the appliance had been originally furnished for that purpose. Accordingly, a qualification of this rule, that a servant can not recover in the absence of evidence showing that the appliance in question was constructed with reference to the use to which it was being put when the accident occurred, is admitted in cases where it appears that it was customary for employes to put it to that use, and that the master knew of this custom." And see 4 Thompson on Negligence, section 4000.

Keeping in mind the qualification which seems to be established by the authorities referred to of the general rule measuring the master's duty with regard to instrumentalities furnished to the servant, and

looking to the evidence in the record before us, we are not prepared to say that the evidence was not sufficient to make an issue as to negligence vel non on the part of appellants in failing to inspect the lid of the oil-box and have it in proper repair for the use appellee attempted to make of it. While the lid primarily was intended for another use, the evidence overwhelmingly established that it was commonly—almost universally—used by appellant's brakemen as appellee was attempting to use it when he was injured. It is not contended, and reasonably it could not be, that appellants were ignorant of the use their switchmen had made and were making of such lids in discharging their duties. Yet they had in no way indicated that they did not approve of the use being made of them by the switchmen. Furthermore, it appeared that the ladders provided on such cars for mounting same, while sufficient for the purpose where the ground was not lower than the track, were not sufficient for the purpose at places along its track where the ground was as much as fourteen inches lower than the track. Appellants should be held to have had knowledge of the limit to the effective use which could be made of the ladders. The case, then, is one where the instrumentalities provided, under all circumstances, were not sufficient to enable the employe to discharge his duties; where in accordance with a custom known to the master to exist the employe attempted, under circumstances which the master knew might arise rendering it necessary for the employe to do so, to make use of an appliance primarily designed and intended to be used for another purpose, to supplement the insufficient appliances furnished to enable him to perform his duties, as the direct result of the master's failure to inspect and properly repair for such use the instrumentality he had, to say the least of it, before commonly permitted to be used to supplement and render effective those he had provided for the purpose. It is but fair, it seems to us, to assume that appellants permitted the use of the lid because they thereby derived benefit, either in being relieved of the necessity of providing means in addition to the ladders of mounting such cars under such circumstances, or in having the switching done more expeditiously than it could be done in the absence of additional means, if such use should not be made of the lid. Such permission, we think, should be construed as having the effect a direction by appellants to their switchmen to so use the lid would have. Had such direction been given by appellants it is clear that it would have become their duty to exercise ordinary care in discovering and repairing defects in the lid which might render it unsafe for such use. And it is equally clear, it seems to us, that it should not be held to be an answer to a claim for damages for injuries resulting to its employe from its failure to exercise such care, that the lid was sufficient for another and primary use for which it had been designed. As we understand them, the authorities cited by appellants in support of their contention are not in conflict with those we have cited, but are only illustrative of the general rule which holds the servant to have assumed the risk of dangers ordinarily incident to his service, or obvious to his senses. In Williams v. Choctaw, O. & G. Ry. Co., 149 Fed., 104, the foreman of a switching crew had slipped and fallen from the foot-board on the rear of the tender of the locomotive while it was moving. The board

was slanting when it should have been level, and water from a leak had fallen and then frozen on it, rendering it slick and dangerous for use. The court held the defect to be an open and obvious one. Here, the testimony tends to show that while the car was moving six or eight miles an hour the fact that the oil-box lid was a wooden one and rotten was not obvious to appellee. He testified: "In mounting a car we usually take observations to see practically how fast the car is going. In mounting a car where you are going to use the oil-box, you make a casual glance as to the condition of the box before you put your foot on it. At a slight observation I could not swear whether I could tell whether the lid was wood or iron. If it was off entirely I might discover it, or if it was down three or four inches below flush I might discover it. If it had a crack in it, split right in two like the one now shown me, I don't think I would notice it. From practical experience we don't look at all those things. It is owing to the speed of the train whether we make casual examinations to see whether the oil-box is there or not, or whether there is the lid on it or not. . . . I believe in my experience you take the entire thing in in a glance—the movement of the train, the position of the handholds— and you will throw your body and catch the oil-box and the stirrup. . . . If a wooden lid was the same color as the iron lid perhaps he would not notice that part. You first take them at a glance—the speed of the car, the handhold, and all that, is taken in one glance. . . . These cars moving along, you have not got time to look at them to tell whether it is a wooden lid or not. They look after they get greasy like a black piece of iron, and just as you put your foot on it probably you glance at it and know it is a wooden lid then." In Cawood v. Chattahoochie Lumber Co., 54 S. E., 944, the plaintiff, while operating a machine for sawing shingles, was injured as a result of his hand slipping while pressing against a block of wood which should have been, but was not, square in shape, and which for that reason failed to respond to the automatic action of the machine. He testified he knew it was dangerous to place his hand on the block as he did, and did so because it was customary with others to do so, and saved time. He further testified that he could have stopped the machine and thereby safely have unfastened and removed the block. Having chosen a dangerous when he might have chosen a safe way to do the work, it was held he was not entitled to recover, his choice of the dangerous way not being excused by the fact that others were accustomed to use it. To about the same effect are New York C. & St. L. Ry. Co. v. Hamlin, 83 N. E., 343, and Hutchinson v. Cohankus Mfg. Co., 112 S. W., 900, and other cases cited by appellants.

The judgment is also attacked upon the ground, as stated in the fifth assignment of error, that the evidence conclusively showed that appellee "was guilty of negligence in using the oil-box as a step and placing his foot against the lid or covering of the oil-box, which negligence was the direct cause of his injuries." In a proposition under said assignment appellants insist that the evidence disclosed two ways by which appellee could have discharged the duty he owed to them: a safe one, by using the ladder alone in attempting to mount the car, and an unsafe one, in using the lid in connection with the ladder in

attempting to mount it. Having chosen the latter way, they insist he was not entitled to recovery. In another proposition under the same assignment appellants further insist that appellee was not entitled to a judgment because it appeared from the evidence that in using the oil-box in attempting to mount the car, he placed his foot against the face of the lid thereof when he should have placed it on top of the box. There was evidence tending to show that on account of the speed with which the car was moving and the low ground at the point where he attempted to mount the car, appellee could not have mounted it by means of the ladder alone, and therefore that he did not have a choice of ways to mount it in the discharge of his duty. Appellants in their brief refer to no evidence and we have found none in the record showing it would have been unsafe for appellee to attempt as he did to use the oil-box in mounting the car, had the lid thereof been in proper repair for the use we think he was authorized to believe appellants had permitted to be made of it. As to appellants' contention that in using the oil-box appellee should have placed his foot on top of it instead of against its lid, it is sufficient to say that the evidence was conflicting as to whether the one or the other way was safest. In fact, the evidence tends to show that the position in which he should place his foot on the box was not always a matter of choice to the switchman, as, on account of the movement of the car, etc., he could not always reach with his foot the particular part of the box he might prefer to rest his foot against. There also was evidence tending to show that no one part of the box was preferable to another in using it as an aid in mounting the car. The witness Conway, for instance, testified: "I don't understand that there is any proper position to put the foot, whether on top of the oil-box or against the face of the box. I think it is up to the man himself."

The judgment is affirmed.

*Affirmed.*